IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

MEDFORD DIVISION

CATHY DEFOREST, LEON PYLE, AND
EDWARD KERWIN,

      Plaintiffs,

      v.

CITY OF ASHLAND, ASHLAND GUN CLUB,
et al.,

      Defendants.

Civ. No. 1:11-cv-03159-CL

**REPORT AND
RECOMMENDATION**

CLARKE, Magistrate Judge.

    Plaintiffs move for summary judgment on their Resource Conservation and Recovery Act ("RCRA") and Clean Water Act claims. Dckt. # 47.    Defendants filed cross motions for summary judgment regarding Plaintiffs' RCRA claim and Endangered Species Act ("ESA") Claim. Dckt. #73.    Plaintiffs' Clean Water Act Claim is held in abeyance.[1] Dckt. # 73, 90.

---

[1] The CWA claim is in abeyance due to ongoing remediation efforts at the Gun Club site that may narrow or eliminate the CWA Claim. Dckt. #72.

For the reasons below, Plaintiffs' motion for summary judgment as to their RCRA claim should be DENIED, and defendants' cross motion as to Plaintiffs RCRA and ESA claims should be GRANTED.

## FACTS

The Ashland Gun Club leases land from the City of Ashland at 555 Emigrant Creek Road, Ashland, Oregon. The lease began in the 1968, and was renewed in 2011. Pls.' Mot. Summ. J., Ex. 31, pp. 1, 17 (Dckt. #61-2). The site slopes downhill towards Emigrant Creek, and environmental studies identify some portions of the site as "wetland." Pls.' Mot. Summ. J., Ex. 1, p. 6-7; 13-14 (Dckt. #48). It is home to native plant and animal species; environmental studies did not find federally threatened or endangered species occurring on the site itself, but found that Coho salmon have been reported in downstream reaches of Emigrant Creek. Pls.' Mot. Summ. J., Ex. 8, p. 12-14 (Dckt. #50).

The Gun Club has been operating on the site since the late 1960's; it built a rifle range in the 1970's, and added a pistol bay, a 50-yard "enclosed bay," and a 100-yard rifle bay in the 1990's. Decl. Smoot, ¶¶3-4 (Dckt. #87, p. 2). "Sporting clay" and "trap" ranges were built in 1996, followed by a skeet range in 2003. *Id.* The site remains an active shooting range, and is used by local law enforcement entities and the National Guard for training purposes, by sportsman for rifle, pistol, and shotgun practice, and by old west "Cowboy Action Shooting" historical reenactment groups. Decl. Peterson, ¶2 (Dckt. #78, p. 2). The Gun Club has required that all users use steel shot, rather than lead, since 2012. *Id.* at ¶¶3-4.

Supporting affidavits show that Gun Club member have engaged in various efforts at recovering and recycling lead shot since approximately the late 1970s. *Infra*, p. 16-18.

In April 2010 the City of Ashland commissioned a substantial environmental study to address concerns regarding the Gun Club activities. The study assessed "chemicals of potential ecological concern," including lead and other materials. It found no indication of chemical or other impact from Gun Club activity to Emigrant Creek waters. Pls. Mot. Summ. J. Ex. 28, p. 22 (Dckt. #60). The report noted evidence of raised lead levels in some soils, and concluded that "further ecological evaluation is indicated for elevated concentration of metals, in particular lead and antimony, in soil samples from the berms used for target practice." *Id.* at 27. A follow-up study in 2012 concluded that "leaching of lead from superficial soil to groundwater has not occurred," and that "elevated total lead concentrations in soil within the shotfall range area are likely limited to the upper 1 to 2 feet of soil." Decl. Lohman, Ex. 2, p. 22 (Dckt. #77-3).

## PRELIMINARY MATTERS

### I.    Jurisdiction

The Court has a duty to affirm its own jurisdiction and standing "even when not otherwise suggested." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (citation omitted). In assessing its Article III standing, the Court "accepts as true all material allegations of the complaint," and construes the complaint "in favor of the moving party." *Davis v. Guam*, 785 F.3d 1311, 1314 (9th Cir. 2015).

To bring a citizen suit under the RCRA, a plaintiff must give notice of intent to sue to three entities: (1) the federal Environmental Protection Agency ("EPA"); (2) the state in which the alleged violation occurred; and (3) the alleged violator. 42 USC § 6972(b). The purpose of such notice is to allow the EPA and other entities time to cure the alleged regulatory defect prior to

commencement of litigation. *Hallstrom v. Tillamook Co.*, 492 U.S. 20, 31-33 (1989) (req. for rehearing denied).[2] This statutory standing requirement is strictly construed without excuse. *Id.*

The ESA similarly requires that a citizen-suit plaintiff give 60 days' notice to the Secretary of the Interior or, in some instances, Commerce. 16 U.S.C. § 1540(g)(2)(A)(i). As under the RCRA, the issue of notice is jurisdictional, and failure to comply is an absolute bar to bringing suit under the ESA. *Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 520 (9th Cir. 1998). The purpose of the notice provision is, again, to provide the agency opportunity to cure the alleged regulatory defect on its own initiative. *Id.*

Because the matter is one of summary judgment, the Court looks to the pleadings and papers before it; they need not meet the evidentiary standard required for trial. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (*citing Fed. Ins. Dep. Corp., v. N.H. Ins. Co.*, 953 F.2d 478, 485 (9th Cir. 1991)). It also construes the Complaint in favor of the moving party. *Davis*, 785 F.3d at 1314. Under this standard, the Court finds Plaintiffs' presentation of copies of notice to the EPA and the National Oceanic and Atmospheric Administration ("NOAA") sufficient to establish standing.

///

///

///

///

///

///

---

[2] *Hallstrom* proceedings began before a District of Oregon Magistrate Judge; the Ninth Circuit and the Supreme Court overturned this Court's finding that citizen-suit plaintiffs could cure failure to give notice to the EPA after filing suit. 492 U.S. at 20.

## II.    Judicial Notice

Plaintiffs filed a Motion for Judicial Notice in conjunction with their Motion for Summary Judgment, asking the court to take judicial notice of 29 documents. This request should be granted in part and denied in part.

FRE 201 instructs that the court may take judicial notice of a fact "not subject to reasonable dispute" in two circumstances: (1) the fact is "generally known within the trial court's territorial jurisdiction," or (2) it can be "accurately and readily determined from sources whose accuracy cannot be reasonably questioned. FRE 201 (b)(1-2). Courts may take notice of website content and press releases, for example, when they are "matters of public record." *Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir. 2009). The Ninth Circuit defines "public records" under FRE 201 to include "records and reports of administrative bodies." *U.S. v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) (citing *Interstate Nat. Gas Co. v. S. Cal. Gas Co.*, 209 F.2d 380, 385 (9th Cir. 1953)). But, when the court takes notice of a public record, including websites, it does so "not for the truth of the facts recited therein, but for the existence of the [record] which is not subject to reasonable dispute over its authenticity." *Vesta Corp. v. Amdocs Management Ltd.*, 129 F.Supp. 3d 1012, 1021 (D. Or. 2015) (Hernandez, J.) (internal citations omitted).

The Court has carefully reviewed Plaintiffs' proffered documents under the standard above. It takes judicial notice of Plaintiffs' Exhibits 2, 3, 4 and 16 because they include filings before this Court, which establishes that they are in the public record. The Court takes notice of Exhibits 22 and 29 that are regulations promulgated by federal agencies. It takes notice of Exhibits 14 and 26 pertaining to their status as publications by federal agencies, but declines to take notice of all the facts contained therein and any subsequent inference.

The Court takes notice of Exhibits 17, 18, 19, 20, 21, 24, 29, 30, 32, and 33 as to the fact of their publication on the internet. Such notice is limited to the purpose of establishing that the information is in the public domain, and does not include notice pertaining to the truth of the contents therein. The Court takes notice of indicated Oregon DEQ websites as to their publication, but declines notice of internet search-engine query results submitted by Plaintiffs in Exhibits 10, 11, and 13.

The Court restricts notice of Exhibits 1, 7, 8, 12, 28, and 31 to the fact that they are reports, letters, and documents prepared for the indicated parties only.[3]  Many of these items relate to environmental reports produced for the City of Ashland and the Gun Club. Plaintiffs have not shown they are matters of public record, and the contents are reviewed under summary judgement standards.

Finally, the Court finds Exhibit 26 sufficiently supported by data to establish the fact of its publication and takes notice of that fact only. It declines notice of Exhibit 25 because no publication data was submitted. It declines notice of Exhibit 5, a chart created by Plaintiffs' counsel, and further finds it in violation of the Best Evidence Rule. Fed. R. Evid. 1002.

### III.    Defendants' Motions to Strike

The Gun Club defendant moves to strike Plaintiffs' exhibits supporting their Motion for Summary Judgment "where the exhibits are not properly subject to judicial notice and are not otherwise authenticated or admissible evidence for summary judgment purposes." Def. Gun Club's Mot., 2 (Dckt. #88). The City of Ashland joined this motion. Dckt. # 89. It should be denied for the reasons that follow.

---

[3] Plaintiffs request notice of an additional excerpt from these papers (Pls. Ex. 9), but a copy was not provided to the Court and will not be addressed.

Rule 56(c)(2) instructs that a party may "object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." The proponent of the evidence proffered at summary judgment "bears the burden of proof of admissibility." *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002). However, to survive summary judgment, a party does "not necessarily have to produce evidence in a form that would be admissible at trial, as long as the party satisfies the requirements of Federal Rule of Civil Procedure 56." *Fraser*, 342 F.3d at 1036-37 (*citing Fed. Ins. Dep. Corp., v. N.H. Ins. Co.*, 953 F.2d 478, 485 (9th Cir. 1991)). At summary judgment, therefore, the court does not focus upon the "admissibility of the evidence's form" but instead focuses upon "the admissibility of its contents." *Id.*

Defendants argue that, except for limited environmental studies, all of Plaintiffs' proffered exhibits are not authenticated and not relevant. Def. Gun Club's Resp., p. 2 (Dckt. # 88). It does not, however, clearly identify evidentiary challenges pertaining to most of these documents, and notes that it "accepts" several of Plaintiffs' exhibits containing environmental studies. *Id.* at 2.

Relevance objections at summary judgment are largely superfluous as they are "duplicative of the summary judgment standard itself." *Burch v. Regents of the Univ. of Cal.*, 433 F.Supp.2d 1110, 1119 (E.D. Cal. 2006); *Ambrose v. J.B. Hunt Transport, Inc.*, No., 12-cv-1740, 2014 WL 585376, at *6 (D. Or. 2016)(Hubel, J). The Court therefore declines the Gun Club's request on this basis.

Finally, the Gun Club also asserts that the declarations of plaintiffs Leon Pyle and Cathy Deforest are not expert testimony. Def. Gun Club's Mot., p. 11 (Dckt. #88). It concludes, "the declarations do not qualify either Plaintiff as an expert qualified to speak on whether there is

actually any migration of lead from the Ashland Gun Club, or any threat to the population or the environment from the activities of the Ashland Gun Club." *Id.* at 12.

Neither the declaration of Mr. Pyle nor that of Ms. Deforest suggests any claim to expert testimony. Statements therein referring to "environmental contamination" (Pyle Decl. p. 2, ¶2 (Dckt. #58-3); Deforest Decl., p. 2 ¶2 (Dckt. # 59-1)) are lay opinion only, and are evaluated as such.

In summary, the Gun Club fails to show that the exhibits and declarations above run afoul of summary judgment evidentiary standards.   For the reasons above, the Court should deny defendants' Motion to Strike (Dckt. #88).

IV.    **Cross Motions for Summary Judgment**

    A.  **Standard**

A party is entitled to summary judgment if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Bahn v. NME Hospitals, Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991).

The moving party carries the initial burden of proof. It meets this burden by identifying portions of the record which demonstrate the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986). Once the initial burden is satisfied, the burden shifts to the nonmoving party to demonstrate through the production of probative evidence that an issue of fact remains to be tried. *Id.*

The court views the evidence in the light most favorable to the non-moving party. *See Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubts as to the existence of a genuine issue of fact should be resolved against the moving party, *Hector v. Wiens*, 533 F.3d 426, 432 (9th Cir. 1976), and inferences drawn from the underlying facts are viewed in the light most favorable to the party opposing the motion. *Valadinham v. Bojorquez*, 866 F.2d 1135, 1137 (9th Cir. 1989). Summary judgment is inappropriate where different inferences may be drawn. *Sankovich v. Ins. Co. of N. America*, 638 F.2d 136, 140 (9th Cir. 1981).

But, deference to the non-moving party has limit. It must "set forth specific facts showing that there is genuine issue for trial." Fed. R. Civ. P. 56(e). Self-serving affidavits are "cognizable" to establish genuine issue of material fact so long as they are based upon personal

knowledge and not too conclusory. *Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir. 2001)(citing *U.S. v. Shumway*, 199 F.3d 1093, 1103-04 (9th Cir. 1999)). "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of material fact and defeat summary judgment." *Soremekun v. Thrifty Payless Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Finally, the "mere existence of a scintilla of evidence" in support of the non-moving party's position is insufficient. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## B.  Resource Conservation and Recovery Act Claim

Plaintiffs' motions for summary judgment on its RCRA claims should be denied, and defendant's cross motion should be granted. The Court separately discusses claims under §§ 6972(a)(1)(A) and (B) of the Act.

The RCRA allows claims regarding (1) permitting violations, and (2) waste disposal. These are distinct mechanisms, to be separately alleged and proven. *Conn. Coastal Fishermen's Ass'n v. Remington Arms Co.*, 989 F.2d 1305, 1313-1314 (2d Cir. 1992) (noting that a District Court failed to distinguish the two claims).

Section (A) allows permitting violation claims against any person "who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order . . . ." Plaintiffs, must, essentially, allege and prove that defendants failed to obtain a permit required by any applicable regulatory authority.

Section (B) allows waste disposal claims against any person "who has contributed to or who is contributing to the past or present . . . disposal of any solid or hazardous waste which may

present an imminent and substantial endangerment to health or the environment."    Here, plaintiffs must show that defendants improperly disposed of waste under applicable regulatory definitions.

Plaintiffs' preamble to their complaint alleges violation of Section (B) waste disposal standards only.  Am. Compl., 2 (Dckt. # 18).  But, they subsequently state that they gave notice of intent to sue under a Section (A) permitting violation standards, *id.* at 4, and discussed permitting violations in their briefing.    Pls.' Mot. Summ. Judge., 39 (Dckt. #47).    Their substantive allegations, however, again refer to Section (B) only.  Amm. Compl., 17, ¶¶88-90. Therefore the court will briefly address Section (A).

### 1.  42 USC § 6972(a)(1)(A) Permit Claim

Plaintiffs' permitting violation argument under Section (A) rests upon a theory that the Oregon Department of Environmental Quality ("DEQ") issues "RCRA permits."  They provide no explanation pertaining to Oregon's regulatory framework, nor do they clearly identify applicable permits.

Plaintiffs' argument directed at the permitting claim relies upon broad citation to a Second Circuit authority. Pls.' Mot. Summ. J., p. 39-40 (citing *Conn. Coastal*, 989 F.2d 1305 (no internal citation provided)).    The Second Circuit *Connecticut Coastal* court addressed requirements for RCRA section (A) permitting violation claims in considerable and dense detail. 989 F.2d at 1311-1316.  It discussed the distinction in pleading section (A) and (B) violations, *id.* at 1312-13, 1315, and noted that a District Court had failed to distinguish between the two claims.  *Id.* at 1313.  The panel concluded that, in a case where the plaintiff had failed to establish a permitting violation claim under identical standards promulgated under the Clean Water Act, the plaintiff necessarily failed to establish a permitting violation claim under section

(A). *Id.* at 1315-16.  In sum, the *Connecticut Coastal* decision does not stand for the general proposition that a gun club is required to possess an RCRA permit.

Plaintiffs' citation to that case therefore establishes no applicable requirement that the Gun Club, or even the City of Ashland, should have obtained an unspecified permit. Plaintiffs, moving for summary judgment, must point to evidence that shows no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Bahn*, 929 F.3d at 1409.  It does not now do so.

The Gun Club, in response and in cross motion, states that Oregon's Department of Environmental Quality ("DEQ") attests that it does not issue RCRA permits.  Def. Gun Club's Resp., 16 (Dckt. # 73).  Mr. Fuller's affidavit states that he is Oregon DEQ's Western Region Manager for its Hazardous and Solid Waste Program.  Decl. Fuller ¶1 (Dckt. #76).  His duties include overseeing the program, "including inspections, technical assistance, coordinating with DEQ's other Regions and headquarters on RCRA policy for the state and implementing statewide policies."  *Id.* at ¶2.  DEQ implements the state's federally approved and delegated RCRA hazardous waste program.  *Id.*  Mr. Fuller stated, "DEQ does not issue RCRA permits for active shooting ranges."  *Id.* at ¶3.

The Gun Club further notes that EPA materials submitted by Plaintiffs state that the EPA does not require permits under the RCRA for "active" shooting ranges.  Def. Gun Club's Resp., p. 16 (citing Pls.' Ex. 14, p. 20 (Dckt. # 55)).  Defendants are therefore entitled to summary judgment on this claim.

///

///

///

///

## 2. 42 USC § 6972(a)(1)(B) Waste Disposal Claim

Plaintiffs' motion for summary judgment pertaining to their section (B) waste disposal claim should also be denied, and the Court should grant defendants' cross motion.

### a. § 6972(a)(1)(B) Standards

§ 6972(a)(1)(B) allows suit against defined entities only. Potential defendants are limited. Actions may be brought against:

> [A]ny person, including the United States and any other governmental instrumentality or agency . . . and including any present or past generator, present or past transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed to or is contributing to the past or present handling, storage treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B). To establish a claim, a plaintiff must therefore show disposal of solid or hazardous waste, which in turn presents imminent and substantial endangerment.

The Act defines "disposal" as the "discharge, deposit, . . . or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be . . . discharged into any waters." 42 U.S.C. § 6903(3). "Solid waste" is subsequently defined as "any garbage . . . and other *discarded* material . . . resulting from industrial, commercial, mining, and agricultural operations, and from community activities." 42 U.S.C. § 6903(27) (emphasis added). The regulatory definition adds the terms "abandoned" and "disposed of." 40 C.F.R. §§ 261.2(a)(2), (b)(1); *accord Connecticut Coastal*, 989 F.2d at 1316.

The crucial component is "discard." The Act does not define "discard," but the Ninth Circuit has held that materials destined for reuse are not "discarded" under the Act. *Safe Air for*

*Everyone v. Meyer, et al.*, 373 F.3d 1035, 1043 (9th Cir. 2004). After establishing that the material is "discarded," and thus constitutes "solid waste" under the RCRA, a plaintiff must subsequently show that the material causes "imminent and substantial endangerment." 42 U.S.C. § 6972(a)(1)(B) to ultimately prevail.

### b. § 6972(a)(1)(B) Analysis

Analysis turns upon the status of the Gun Club's spent lead shot within the regulatory framework above. The parties rely upon limited materials promulgated by the Environmental Protection Agency ("EPA") and caselaw.

### i. EPA Theory

The EPA is charged with administering RCRA. 42 U.S.C. §§ 6905 and 6907. Plaintiffs assert that the EPA has independently determined that spent lead shot is "discarded" under the Act, thus establishing that it is "solid waste" under the RCRA. Pls. Mot. Summ. J., 29-30. Here Plaintiffs point generally to the EPA's 2005 Region 2 "Best Management Practices" ("BMP") publication. *Id.* The Court located this document in Plaintiffs' Exhibit 14 (Dckt. # 55). The publication is addressed to EPA's Region 2. Ex. 14, p. 1 (Dckt. #55). Region 2 serves New York, New Jersey, Puerto Rico, the U.S. Virgin Islands, and eight tribal nations. EPA Region 2, https://www.epa.gov/aboutepa/epa-region-2 (last visited July 9, 2016). Other district courts have found that the EPA Region 2 manual is "admittedly advisory, does not constitute official rulemaking, and is at best entitled to slight deference." *Otay Land Co. v. U.E. Ltd., L.P.*, 440 F.Supp.2d 1152, 1164-65 (S.D. Cal. 2006) (rev'd on other grounds).

Defendant the City of Ashland in turn points to EPA's *2001* "Best Management Practices for Lead at Outdoor Shooting Ranges." Def. City's Resp., 11 (Dckt. #90) (emphasis added). Inspection shows that the City does not cite a document now before the Court in support of

summary judgment proceedings. Instead, it quotes from a 2009 Second Circuit case addressing a somewhat similar claim. *Id.* (citing *Cordiano v. Metacon Gun Club*, 575 F.3d 199, 207 (2d Cir. 2009)).

The 2005 EPA "Best Practices" publication now before the Court encompasses 55 pages, and Plaintiffs do not now point the court to any confirmation that the EPA itself construes discarded lead shot as solid waste under the RCRA. Throughout, the EPA emphasizes "best management practices;" it does not state circumstances where, in its opinion, RCRA liability arises. Instead, the EPA outlines various environmental and regulatory "concerns" at shooting ranges related to lead. *Id.* at 14-18. It then describes Second Circuit litigation arising from citizen suits brought under the RCRA and Clean Water Act, and notes significant Second Circuit decisions. *Id.* at 18-19. In conjunction with this summary, it states:

> Lead shot is not considered a hazardous waste subject to RCRA at the time it is discharged from a firearm because it is used for its intended purpose. As such, shooting lead shot (or bullets) is not regulated *nor is a RCRA permit required to operate a shooting range*. However, spent lead shot (or bullets), left in the environment, is subject to the broader definition of solid waste written by Congress and used in sections 7002 and 7003 of the RCRA statute.

*Id.* at 20 (emphasis added). It then provides "guidance," in bold print, for shooting range management. Specifically, the EPA states that, "lead, if recycled or reused, is considered scrap metal and is, therefore, excluded from RCRA." *Id.*

### ii. Status of Spent Shot

The Act instructs that "disposal of any solid or hazardous waste" raises potential liability. § 6982(a)(1)(B). "Disposal" includes "discharge" of solid or hazardous waste, 42 U.S.C. §6903(3), and "solid waste" is defined as "discarded material." *Id.* at (27). As noted, the Ninth

Circuit has promulgated a three-part test to determine whether matter has been "discarded" under the Act. *Safe Air*, 373 F.3d at 1043. That test considers recycling and reuse activities. *Id.*

Plaintiffs repeatedly assert that "over the past 47 years, Defendants have collected lead from the property on only two occasions," and consequently, assert that it has "discarded" spent lead shot under the Act. Pls.' Mot. Summ. J., 5, 24, 25 (Dckt. #24). The Gun Club vigorously disputes this (Def. Gun Club's Resp. 11-16), as does the City. Def. City's Resp., 13-16.

Plaintiffs' here rely again upon *Connecticut Coastal*. That panel found Gun Club liability under the RCRA when a Gun Club had disposed *5 million* pounds of lead shot and *11 million* pounds of clay target material in coastal waters, with no cleanup effort at all over a 70-year period. *Connecticut Coastal*, 989 F.2d at 1308. The facts below are distinctly different.

Evidence produced by the Gun Club addresses efforts with spent lead shot beginning in the late 1970s and continuing to into 2015.

Gun Club member Bob Smoot declared that he has been a member since 1971, and that "between 1975 and 1980 I personally mined lead out of the range to recast into round muzzle loader balls. I was not the only Ashland Gun Club member mining lead for recasting at this time. Several other members reclaimed spent lead munitions only." Decl. Smoot, ¶¶1, 5 (Dckt. # 87, p. 2). Mr. Smoot also stated that in November 2015 "I personally delivered 1,647 lbs of lead that was reclaimed from the Ashland Gun Club to White City Metals for recycling." *Id.* ¶6.

Chuck Gettling submitted a declaration stating that he "mined lead for reloading ammunition for personal use during the 1970s and 1980s. I remember Bob Smoot doing the same during some of this time period." Decl. Gettling, ¶ 2 (Dckt. # 82, p. 2). Cory Longiotti submitted a declaration stating that he began shooting at the club since 1991, as a high school student, and has "reclaimed lead from the Ashland Gun Club property for recasting and reloading since

Page 16 – **REPORT & RECOMMENDATION**

1991." Decl. Longiotti, ¶¶ 1-2 (Dckt. #84, p. 2). David Morris declared that he has been club member since 1991, and has reclaimed lead material for his own use since the late 1990s, and that "In my experience with the sort of Cowboy Action Shooting, it is common for participants to recycle lead for their own personal use in this matter." Decl. David Morris, ¶¶ 1-4 (Dckt. #85-2).

Gun Club member Bob Morris submitted a declaration stating that his membership began in the 1990s, and that he served on the Club's board between 2006 and 2011. Decl. Bob Morris ¶1 (Dckt. # 86-2). During this period, "club members were mining berms by hand." *Id.* ¶3. The Board discussed implementation of commercial mining operations, but postponed the matter until its lease was renewed. *Id.* ¶4. Following the lease agreement, the Board retained Larry Stockman to mine the non-wetland portion of the range. The Club continued to mine the berms by hand. *Id.*

The declaration of Ken Casteel states that, as a Gun Club member from 2006-2015, he participated in lead reclamation efforts, delivered mined shot to local recyclers, observed Larry Stockman's mining activity, organized lead mining work parties, and performed additional mining activities himself. Decl. Casteel, ¶¶ 1-8 (Dckt. #79, p. 2). Additional copies of the Club's year end reports, described above, are attached to Mr. Casteel's declaration. *Id.* at 5-10.

The record now before the Court shows Gun Club 2011 meeting minutes addressing lead mining (Dckt. #74, p. 6, Dckt. #78, p. 6), and associated receipts from Northwest Shot Manufacturing for receipt of reclaimed lead from the Gun Club on three occasions between April 2009 and September 2011. *Id.* at 8-10.

Finally, documentation for the period between 2011 and 2014 is associated with the declaration of Gun Club secretary Gary Peterson and attached exhibits. Dckt. #78. Specifically,

September 13, 2011 meeting minutes stated the club was closed so that lead reclamation could be performed, and instructing members that the Gun Club's mined lead "must be recycled, and not disposed of, as lead is NOT a solid waste when being use for bullets and/or shot." Decl. Peterson, Ex. 3 (Dckt. #78, p.13). An additional document entitled "2008-2011 End of Year Bullet Material Report for Ashland Gun Club" states that during this period bullet material was "screened from the backstops . . . and the Enclosed 50 Yard Bay. The material was taken to Larry Stockman in Phoenix, Oregon for recycling. Larry issued receipts . . . [which were] turned over to the AGC Executive Committee." Peterson Decl. Ex. 4 (*id.* at 15). The associated receipts were concurrently submitted to the record now before the Court. *Id.* at 17-21. Mr. Peterson's declaration contains a 2012 year-end report stating that "bullets and bullet material" was reclaimed from the pistol bays, also with receipts. Peterson Decl. Ex. 5 (*id.* at 23-25). The 2013 year-end report, with associated receipts, states that bullets and material were reclaimed from the pistol and rifle bays. Peterson Decl. Ex. 6 (*id.* at 27-35). Documents pertaining to 2014 show that the Club mined Pistol Bays 1 and 2, as well as its 50-Yard Bay and Rifle Bay. Peterson Decl. Ex. 7 (*id.* at 36-68). Finally, the declaration indicates reclamation efforts between January and August 2015. Peterson Decl. Ex. 8 (*id.* at 70-82).

Plaintiffs' motion for summary judgment does not address this substantive evidence in any detail, instead relying upon their motion to exclude such evidence. Pls.' Resp., p. 1-5 (Dckt. #94). The Gun Club, in its own motion for summary judgment, simply asserts that it collected lead shot, which was subsequently reused, between the 1970s and 2015. Def. Gun Club's Resp., 5-8, 13-15. Review of the evidence shows that the Gun Club's reclamation efforts and associated record keeping began as an ad hoc effort in the 1970s and 1980s, and continued in an

increasingly organized fashion in the decades that followed. Review shows that the Gun Club's efforts significantly increased throughout the period from 2008 to 2015.

Here, the Gun Club's lead reclamation activity may at times in its history been disorganized and sporadic. However, the record now before the Court also shows that in later years it established policies and procedures relating to reclamation, and receipts verify that the spent shot was inventoried.

These declarations therefore establish that no reasonable question of fact arises regarding the Gun Club's lead shot reclamation.

The Ninth Circuit has established a test to "identify relevant conclusions" as to whether matter has been sufficiently "discarded" to qualify as "solid waste" under § 6982(a)(1)(B). *Safe Air for Everyone*, 373 F.3d at 1043. The court evaluates:

> (1)     Whether the material is "destined for beneficial reuse or recycling in a continuous process by the generating industry itself;
> (2)     Whether the materials are being actively reused, or whether they merely have the potential for being reused;
> (3)     Whether the materials are being reused by its original owner, as opposed to use by a salvager or reclaimer.

*Id.* (internal citations omitted). Notably, the Circuit does not instruct that this is a bright-line test; it is a test of "relevant conclusions." *Id.* This court has previously looked to the *Safe Air* factors in evaluating the status of lead shot as "discarded" waste under § 6982(a)(1)(A). *Benjamin v. Douglas Ridge Rifle Club*, 673 F.Supp. 2d 1210, 1221-1222 (D. Or. 2009)(Haggerty, J.).

In *Benjamin*, this court's earlier analysis of a § 6982(a)(1)(A) claim found that the *Safe Air* test was not met when a Gun Club defendant failed to provide evidence at summary judgment relating to lead shot reclamation over a fifty-four year period. *Id.* at 1222. There, no

evidence was submitted in conjunction with summary judgment proceedings to show that any reclamation efforts had been made.  This is not the present case.

The Gun Club's historical recollections  state that individual members mined material for their own use, and reformulated it into lead bullets.  Such activity satisfies the first and second *Safe Air* prongs.  Later, lead shot was turned over to Larry Stockman and other Oregon vendors for recycling and reformulation as lead shot.  This practice also satisfies the first prong, which affirms that beneficial reuse or recycling occurs in the same industry.  Material reformed as ballast and lead anchors in the marine industry do not satisfy this test, but adequately meet the second *Safe Air* prong relating to "active reuse."

Finally, though material was transmitted to other vendors, and thus separated from its original owner, the Court does not find such severance runs afoul of the third *Safe Air* prong. Under the third and final prong evaluating "relevant considerations" pertaining to section (B) solid waste analysis, the Ninth Circuit directs the Court to consider whether the material is being reused by its original owner.  *Safe Air for Everyone*, 373 F.3d at 1043.  Here the Circuit relied upon Eleventh Circuit discussion of battery recycling efforts, which in turn relied upon EPA regulations specific to disposal of spent batteries.  *Id.* (citing *U.S. v. ILCO, Inc.*, 996 F.2d 1126, 1131 (11th Cir. 1993) (internal citations omitted)).  As discussed above, the EPA has specifically and plainly advised that shooting lead shot, or bullets, does not constitute "discarded" waste. Unlike the *ILCO* battery discussion, neither party now points to applicable EPA regulations further governing lead shot.  Further, the summary judgment record shows that Gun Club members collected spent shot and reformulated it for their own use at instances throughout its history.

In summary, the record now before the Court at summary judgment shows that the Gun Club collected and recycled lead shot beginning in the 1970s and continued to do so throughout the period under review. These activities sufficiently show that the Gun Club recycled and reused the material, rather than discarded it, under controlling Ninth Circuit authority. Without a finding of discarded waste, RCRA liability cannot attach. The Court, therefore, will not further discuss RCRA liability under the statute's subsequent requirements.

## V.    ESA Claim

Plaintiffs claim that the Gun Club's activities constitute discharge of lead shot, lead bullets, shells, and clay pigeon debris into Emigrant Creek waters, and that this in turn constitutes a "take" of Coho salmon in violation of the ESA. Pls. Amm. Comp. p. 17, ¶¶ 91-95. Dckt. # 18.

### A.    ESA Standards

A "take" of any endangered species is a violation of the Act. 16 U.S.C. § 1538(a)(1)(B). The Act defines "take": "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The Ninth Circuit holds that "imminent threat of future harm" is sufficient to establish harm under the Act. *Marbled Murrelet; Envtl. Protection Cent. v. Babitt et al.*, 83 F.3d 1060, 1064 (9th Cir. 1996) (internal citations omitted). Further, "habitat modification which significantly impairs breeding and sheltering of a protected species amounts to "harm" under the ESA." *Id.* at 1067 (citing 50 C.F.R. § 17.3).

### B.    Analysis

Plaintiffs base their claim upon alleged discharge of lead shot and other Gun Club materials into Emigrant Creek waters. Am. Compl., ¶¶91-95 (Dckt. #18); Pls. Resp. to Def. Mot. Summ. J., 12 (Dckt. #94).

### 1. Controlling Definition of "Harm"

The parties agree that Emigrant Creek contains Coho Salmon, though the Gun Club distinguishes that the wetlands on its site are not salmon habitat. Def. Gun Club's Resp., p. 21 (citing Brown and Caldwell April 16, 2010 study (Pls.' Ex. 28)). The Gun Club asserts that Plaintiffs plead no facts establishing that the Gun Club killed or injured Coho salmon and, additionally, that salmon do not eat various small land animal species Plaintiffs describe in factual statements related to their own motion for summary judgment. Def. Gun Club's Resp. and Cross Mot., 20 (Dckt. #73). The City of Ashland joins the Gun Club's motion (Dckt. #89). a Def. City's Resp., p. 25 (Dckt. # 90). Both defendants rest their argument upon quotation from a 1993 First Circuit authority finding that lead shot, in the context of deer hunting, did not cause harm to bald eagles preying upon deer unrecovered by hunters. The First Circuit, in turn, quotes the *1981* legislative history pertaining to 1992 regulations, and specifically relies upon language stating that "harm" must constitute "actions . . . which actually (as opposed to potentially), cause injury . . . ." Def. City's Resp., p. 22 (quoting *Am. Bald Eagle v. Bhatti*, 9 F.3d 163, 165-166 (1st Cir. 1993) (quoting 46 Fed. Reg. 54,748, 54,749 (1981)); *see also* Def. Gun Club's Resp., 21-23 (Dckt. #73).

This posture is based upon an overly narrow reading of the Act. As noted, the Ninth Circuit considers both imminent threat of future harm and habitat modification, as it relates to breeding and sheltering, "harm" under the ESA. *Marbled Murrelet*, 83 F.3d at 1067.

### 2. Gun Club Site Flooding

In addressing the establishment of relevant harm, the Gun Club asserts that its construction of earthen berms on the site made no impact on salmon habitat because the salmon do not live or pass through the site's wetlands. Def. Gun Club's Resp., 24 (Dckt. #73). This is not however

entirely responsive to Plaintiffs' theory that flooding from the site's wetlands causes downriver harm to salmon.

Plaintiffs' argument is based on the inference that the Gun Club site is prone to flooding, and that activities on the site and its wetland component therefore directly effect Emigrant Creek. Here, Plaintiffs first point to the JBR environmental study. Pls. Resp., 3 (citing Ex. 1, p. 3). It states that the site's wetlands "receive a significant portion of their hydrology from overbank flooding." *Id.* Plaintiffs also point to an exhibit purporting to show FEMA flood designations. *Id.* (citing Ex. 16). The court locates Exhibit 16 as a two-part attachment to Plaintiffs' earlier motion for summary judgment. Dckt. #57-1, 57-2. The first potion of the exhibit is a copy of a FEMA floodplain insurance rate document. Dckt. #57-1. It shows a schematic outline of Ashland and its surrounds only. The second portion of Exhibit 16 is a screenshot of a website "ersi.com," and apparently shows the results of query "555 Emigrant Creek Rd, Ashland." Dckt. #57-2. The document presented shows a map indicating "Lithia Springs Gun Club" as its center point, and is accompanied by a legend labelled "Oregon Special Flood Hazard Area." *Id.*

The court must view this evidence under summary judgment standards and, consequently, inferences drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Valadingham*, 866 F.2d at 1137. Assuming without deciding that the Gun Club's wetlands flow into Emigrant Creek, the ESA claim turns upon harm caused by such floodwaters.

The defendants argue that Plaintiffs' establish no identifiable harm flowing from any lead exposure to salmon. Def. Gun Club's Mot., 22-23 (Dckt. #73); *accord* Def. City's Mot., 27-30 (Dckt. #90). Defendants correctly state that Plaintiff has provided no evidence of lead exposure to salmon. Def. Gun Club's Mot., 23 (Dckt. #73); *see also* Def. City Mot., p. 17-18 (Dckt. #90).

Page 23 – **REPORT & RECOMMENDATION**

Even under summary judgment's broad inferential standard, *Valadinham*, 866 F.2d at 1137, no sustainable inference shows the presence of lead in salmon. The burden thus shifts to Plaintiffs to show that an issue of fact remains to be tried. *Celotex*, 477 U.S. at 322-24.

Plaintiffs do not clearly address this argument, instead citing documents identifying the broad mammalian effects of ingesting lead. Pls.' Reply. 14, 15. These documents do not address lead in the instant waters, do not address fish, and do not address harm germane to Coho salmon under the standards pertaining to the Act. The Court, therefore, is asked to infer both (1) that Emigrant Creek waters do in fact contain lead as a result of upstream and dry land Gun Club activities; (2) that fish, including Coho salmon have ingested such lead; and (3) that this theoretical lead exposure has harmed Coho salmon under the definitions promulgated under the Act.

This inferential argument stretches plausibility under even the most liberal summary judgment standards. Plaintiffs have not produced evidence establishing that actual or potentially sufficient levels of lead exist in the water that actually or potentially harm salmon. In other words, assuming *arguendo* that the waters contained lead traceable to the Gun Club's activities, Plaintiffs have produced no evidence that this affects downstream salmon habitat in a manner that constitutes "harm" under the ESA.

///

///

///

///

///

///

Page 24 – **REPORT & RECOMMENDATION**

///

## RECOMMENDATION

For the reasons set forth above, Plaintiffs' Motion for Judicial Notice (Dckt. #62-1) should be GRANTED in part and DENIED in part. Defendants' Motion to Strike (Dckt. #88, 89) should be DENIED. Plaintiffs' Motion for Summary Judgment pertaining to their RCRA and ESA claims (Dckt. #47) should be DENIED. Defendants' cross motions for summary judgment pertaining to the RCRA and ESA claims (Dckt. #73) should be GRANTED.

This Report and Recommendation will be referred to a district judge. Objections, if any, are due no later than fourteen (14) days after the date this recommendation is filed. If objections are filed, any response is due within fourteen (14) days after the date the objections are filed. See Fed. R. Civ. P. 72, 6. Parties are advised that the failure to file objections within the specified time may waive their right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED this ____25____ day of July, 2016.

MARK D. CLARKE
United States Magistrate Judge